UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
CHRISTINA CERQUEIRA,

                Plaintiff,             **MEMORANDUM OF**
                                         **DECISION AND ORDER**
   -against-                        **14-cv-1134(ADS)**

CAROLYN COLVIN, Acting Commissioner
of Social Security,

                Defendants.
-----------------------------------------------------------------x

**<u>APPEARANCES</u>**

**LAW OFFICES OF SULLIVAN & KEHOE, LLP**
*Attorneys for the Plaintiff*
44 Main Street
Kings Park, NY 11754
      By:   Michael Brangan, Esq., Of Counsel

**OFFICE OF THE UNITED STATES ATTORNEY**
   **FOR THE EASTERN DISTRICT OF NEW YORK**
*Attorneys for the Defendant*
610 Federal Plaza, 5th Floor
Central Islip, NY 11722
      By:   Kenneth Abell, Esq., Assistant United States Attorney

**SPATT, District Judge:**

On February 21, 2014, the Plaintiff Christina Cerqueira ("Plaintiff" or

"Cerqeira") commenced this action pursuant to the Social Security Act,

42 U.S.C. § 405(g) (the "Act"), challenging a final determination by the Defendant

Acting Commissioner of Social Security Carolyn Colvin (the "Defendant" or

"Commissioner"), that she was ineligible for Social Security disability benefits.

Presently before the Court is the Commissioner's motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 12(c). Also before the Court is the Plaintiff's cross-motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).

For the reasons set forth below, the Commissioner's motion is denied; the Plaintiff's cross-motion is granted in part and denied in part; and this matter is remanded for further administrative proceedings consistent with this opinion.

## I. Background

## A. Procedural History

On August 25, 2011, the Plaintiff filed an application for Social Security disability benefits, alleging a disability and inability to work since March 15, 2011 due to systemic lupus erythematosus ("lupus"); hypertension; irritable bowel syndrome ("IBS"); degenerative disc disease; and carpal tunnel syndrome.

On November 7, 2011, the Social Security Administration ("SSA") denied her application.

On December 14, 2011 the Plaintiff made a timely request for a hearing before an Administrative Law Judge ("ALJ").

On October 2, 2012, a hearing was held before ALJ Andrew S. Weiss. The Plaintiff was the only witness to testify at the hearing.

On October 17, 2012, following the hearing and a review of the record, ALJ Weiss issued a decision denying the Plaintiff's claim for disability benefits. He acknowledged that the Plaintiff's impairments caused significant limitations in her

ability to perform basic work activity, but nevertheless found that that she retained the residual functional capacity ("RFC") to perform the full range of sedentary work, as defined in 20 C.F.R. § 404.1567(a).

On November 24, 2012, through counsel, the Plaintiff sought review of the decision of ALJ Weiss by the Appeals Council.

On January 6, 2014, the Appeals Council denied the Plaintiff's request for review. The Plaintiff then commenced the present appeal from the October 17, 2012 decision of ALJ Weiss.

**B.     The Administrative Record**

The following facts are drawn from the administrative record, which was filed for the Court's review with the parties' briefs.

As stated above, on November 7, 2011, the SSA denied the Plaintiff's initial application for disability benefits. In particular, based on the medical evidence before it, the SSA determined that, although the Plaintiff suffers from an impairment, her condition is not severe enough to prevent her from performing her past work, namely, that of an administrative assistant or telemarketer.

On December 14, 2011, the Plaintiff requested a hearing before an ALJ.

**1.     The Medical Evidence Before the ALJ**

The Plaintiff, 46 years of age at the time of the alleged onset of her disability, supplied medical information to the ALJ in advance of the hearing. That evidence is summarized below.

On November 24, 2004, x-rays were taken of Cerqueira's lumbar spine and knees. A report of the findings noted a mild loss of disc space at L5-S1; facet joint sclerosis; increased sclerosis around the sacroiliac joints; and slight lipping in the upper lumbar spine. Increased bony sclerosis at the superior side of L5 was indicative of degenerative changes.

As to her right knee, the report noted osteoarthritic degenerative changes, with narrowing of the medial joint space. Similarly, as to her left knee, it noted early degenerative arthritic changes.

An April 17, 2006 MRI of Cerqueira's left knee showed a small area of bone bruising on the lateral femoral condyle; a partial ACL tear; and small joint effusion.

Notes from a November 16, 2006 office visit with Dr. Max Hamburger of Rheumatology Associates of Long Island indicate that Cerqueira was diagnosed with lupus; hyperlipidemia; sacrococcygeal arthritis; and primary localized osteoarthritis in her lower leg. The report does not specify which leg was affected by osteoarthritis.

The Plaintiff returned for subsequent office visits to Dr. Hamburger on January 3, 10, 17, 24, and 31, 2007, to receive Supartz injections in both knees. On February 6, 2007, she received an injection of Hyalgan in her right knee.

The Plaintiff periodically completed Multidimensional Health Assessment Questionnaires during her office visits to Dr. Hamburger, in which she reported her symptoms. On October 1, 2007, on one such questionnaire, Cerqueira reported that, in the preceding week, she had been able to get dressed, bathe herself, get in and

4

out of bed and cars, walk outdoors on flat ground, and bend down to pick up clothing from the floor without any difficulty. She reported mild to moderate pain in her knees, back, and left wrist.

Cerqueira also reported multiple symptoms related to IBS, including heartburn or stomach gas; stomach pain or cramps; nausea; and diarrhea.

On October 3, 2007, Dr. Stuart Katz of BAB Radiology performed a CT scan of Cerqueira's abdomen, which revealed symptoms of a small cyst or scarring on her left kidney. However, a follow-up scan on August 20, 2008 was negative for the presence of a cyst.

Cerqueira returned to Rheumatology Associates of Long Island for office visits on several occasions during 2008.

On January 7, 2008, her discomfort was moderately severe, and Dr. Hamburger noted that her pattern of joint symptoms had consisted of episodic flare-ups with symptom-free periods in between. The joints primarily affected were her right elbow and left knee. In those areas, Dr. Hamburger noted tenderness that had worsened since her last visit.

Also on January 7, 2008, Cerqueira reported some difficulty getting dressed, as well as mild to moderate pain in her right elbow and shoulder; her left hip; her knees; her back; and her left ankle.

Notes from an April 11, 2008 visit indicate that Cerqueira's diagnosed osteoarthritis was causing her mild discomfort. Her pattern of joint symptoms again consisted of episodic flare-ups with symptom-free periods in between. Her

pattern of joint symptomology from lupus was stable and nonprogressive. Dr. Hamburger specifically included a note that read "knees good." A follow-up visit on April 22, 2008 revealed no material change in swelling or tenderness. During both visits, the Plaintiff's compliance with her lupus treatment had been good.

On April 22, 2008, Cerqueira reported that she had some difficulty getting dressed and walking outdoors on flat ground. She reported mild to moderate pain in her right hip; her knees; and her back. She also reported gastrointestinal issues, including stomach pain or cramps; constipation; and diarrhea. In this regard, the Plaintiff indicated that she had begun taking a new medication, Librax, to control "severe IBS."

By August 11, 2008, Cerqueira reported that she had been able to get dressed, bathe herself, get in and out of bed and cars, walk outdoors on flat ground, and bend down to pick up clothing from the floor without any difficulty. She reported mild knee and back pain, and the gastrointestinal symptoms outlined above.

Notes from a November 24, 2008 visit are consistent with the Plaintiff's prior visits. However, Dr. Hamburger noted that Cerqueira did not experience knee and elbow pain since her last visit. The notes further indicate that she experienced acute lower back pain, for which she was taking Vicodin.

On March 11, 2009, the Plaintiff's prognosis was not materially different, except that the primary joints affected by osteoarthritis were her hips, and no longer her elbow and knee.

On March 11, 2009, Cerqueira reported that she had been able to get dressed, bathe herself, get in and out of bed and cars, walk outdoors on flat ground, and bend down to pick up clothing from the floor without any difficulty. She reported mild to moderate pain in her hips and back, but nowhere else.

Similar conditions were indicated during a June 23, 2009 visit, with an additional note by Dr. Hamburger that the Plaintiff's gastrointestinal symptoms, which had previously included symptoms secondary to IBS, were "much improved."

The Record includes a note from Dr. Ranjana Mehta, dated July 31, 2009. It is clear that this note was not prepared in the course of providing medical treatment and was not intended to convey diagnostic information. Nevertheless, the note indicates that his medical practice has treated the Plaintiff since 1985 for medical issues, including stress and anxiety.

In addition, an August 22, 2009 note on Dr. Ranjana Mehta's prescription pad states that Cerqueira was "fully disabled" at that time.

On September 22, 2009, Cerqueira again visited Rheumatology Associates of Long Island. As had been recorded during prior visits, the Plaintiff's diagnosed osteoarthritis was causing her mild discomfort. Her pattern of joint symptoms consisted of episodic flare-ups with symptom-free periods in between. Her pattern of joint symptomology from lupus was stable and nonprogressive. At this time, Dr. Hamburger noted that the primary joint affected by the Plaintiff's osteoarthritis was her lumbar spine, with intermittent lower back pain extending to her right buttock. His notes indicate that Cerqueira's pain was stable, and not worsening.

Dr. Hamburger noted tenderness in the Plaintiff's fourth and fifth spinous processes; in the bilateral lumbar paraspinous muscle; and in her right gluteus maximus. She had a limited range of motion, with flexion of 90 degrees, without pain. Similar notes were recorded on February 24 and November 15, 2010. On November 15th, Dr. Hamburger noted that Cerqueira rated her quality of life as "much better" than her last visit.

In health assessment questionnaires dated September 22, 2009 and February 24, 2010, she reported that, in the preceding weeks, she had been able to get dressed, bathe herself, get in and out of bed and cars, walk outdoors on flat ground, and bend down to pick up clothing from the floor without any difficulty. She reported no pain in her extremities. However, in September 2009, she also reported moderate back pain, stomach pain, and cramps. Also, in February 2010, she reported mild back and neck pain.

On April 12, 2011, she reported moderate pain in her left hip, and mild pain in her left wrist, fingers, knee, ankle, and toes. She complained of mild pain in her right shoulder, but no other pain on her right side. Again at this time, she reported mild back and neck pain. However, she reported no gastrointestinal symptoms.

On July 5, 2011, Dr. Richard Pearl of North Shore Neurological Consultants, P.C. examined the Plaintiff. His notes indicate that Cerqueira had a history of back pain, which began causing a "pins and needles" sensation from her left hip down her leg in March of 2011. Dr. Pearl noted that the Plaintiff had lupus, which was under

control, and no bowel or bladder dysfunction, other than IBS. He noted that she takes Librax for her IBS.

Dr. Pearl noted that Cerqueira was overweight, 335 pounds at the time of her visit; smoked a pack of cigarettes a day; had been hypertensive for more than 20 years; and had a history of diabetes in her family.

A neurological examination showed the Plaintiff to be alert, oriented, and attentive. Dr. Pearl noted that she had normal concentration; normal speech and language; and her recent and remote memory was intact. His impression was that Cerqueira has a lumbrosacral radiculopathy and that polyneuropathy was in the differential. He ordered further testing.

On July 8, 2011, at North Shore Neurological Consultants, the Plaintiff complained of "left sided low back pain down the left leg with numbness since March 2011." She also reported "chronic intermittent tingling of the toes bilaterally." EMG and nerve conduction studies were performed, the results of which were consistent with symmetrical sensory polyneuropathy in the lower limbs, but showed no evidence of lumbar radiculopathy. The exact etiology of polyneuropathy could not be ascertained, and clinical correlation was recommended.

On July 12, 2011, the Plaintiff reported that she had been able to get dressed and bathe herself without any difficulty. She reported some difficulty getting in and out of bed and cars; walking outdoors on flat ground; and bending down to pick up clothing from the floor. She also reported moderate pain in her left hip and

ankle, but no pain on her right side. She reported mild back and neck pain, and no gastrointestinal symptoms.

An August 6, 2011 MRI of her lumbar spine showed degenerative disc disease with small bulges at L1-2 and L3-4, with the remaining lumbar and lower thoracic discs being unremarkable.

The August 15, 2011 notes from North Shore Neurological Consultants indicate a history of numbness and tingling in Cerqueira's hands, as well as carpal tunnel syndrome and lupus. The results of EMG studies indicated mid- to early-stage bilateral carpal tunnel syndrome.

A September 15, 2011 sonogram of the Plaintiff's head and neck showed bilateral complex thyroid nodules and enlargement of the right thyroid lobe. Further surveillance was recommended.

On October 11, 2011, Dr. Hamburger again examined Cerqueira. His notes indicate that her back and leg pain was causing her to lose sleep. He also noted that she experienced pain from her neck extending down into her fingers, with her entire hand sometimes going numb. In addition, she experienced mildly uncomfortable osteoarthritis. Dr. Hamburger noted that the Plaintiff's pattern of joint symptoms consisted of episodic flare-ups with symptom-free periods in between. She had been compliant with her lupus treatment and her joint symptomology was stable and nonprogressive. He noted that Cerqueira was experiencing stress in connection with a spousal issue and fatigue, specifically noting that she falls asleep within a half hour after sitting down to watch television.

On October 11, 2011, Cerqueira reported that she had been able to get dressed, bathe herself, and get in and out of a car without any difficulty. She also reported some difficulty getting in and out of bed, walking outdoors on flat ground, and bending down to pick up clothing from the floor. She reported mild pain in her left shoulder and her right fingers, wrist, elbow, and shoulder. She reported moderate back pain and mild neck pain. She also complained of, among other problems, gastrointestinal symptoms, including stomach pain and cramps; constipation; and diarrhea. She also reported having numbness and tingling in her arms and legs.

On November 3, 2011, the New York State Division of Disability Determinations requested that the Plaintiff's file be evaluated by one of its consulting physicians, one Dr. Marasigan. He reviewed parts of Cerqueira's file dating back to her partial ACL tear in 2006, although he mistakenly noted that the ACL tear occurred in 2004. In this regard, he noted that the Plaintiff followed up for the osteoarthritis in her left leg, but that her joint symptoms had been episodic and asymptomatic in between. Similarly, consistent with Dr. Hamburger's findings, Dr. Marasigan noted that Cerqueira's joint symptoms related to lupus were stable and nonprogressive. While the Plaintiff complained of fatigue and had bilateral tenderness of the paraspinous muscle, her range of motion was painless.

Dr. Marasigan did not address the Plaintiff's IBS or related symptomology.

Also, Dr. Marasigan did not examine the Plaintiff. Nevertheless, he concluded that Cerqueira could lift and carry 10 pounds; stand for two hours in an

eight-hour workday; and sit for six hours in an eight-hour workday. He noted that, to the degree she needed to alternate between sitting and standing, she could do so during breaks and a lunch period. Of importance, Dr. Marasigan, the New York State physician, also noted that the medical evidence available to him established the existence of a disability, although he did not specify which of the Plaintiff's various impairments he was referring to. However, he concluded that the severity of that disability was not sufficiently established because Cerqueira's symptoms had been stable and nonprogressive.

A February 9, 2012 MRI of the Plaintiff's brain revealed no vestibular schwannoma or retrocochlear mass, and no acute intracranial abnormality. The report noted minor nonspecific white matter changes.

Dr. Hamburger's notes from April 17 and July 23, 2012 office visits consistently indicate that Cerqueira was experiencing mild discomfort due to osteoarthritis in her cervical and lumbar spine, and her hips, but that, as before, her pattern of joint symptoms consisted of episodic flare-ups with symptom-free periods in between. He noted that her local lumbar pain and joint stiffness was chronic and that she complained of right wrist pain radiating up her forearm. In addition, his report noted that the Plaintiff claimed to have developed vertigo in January, but that the February 9th brain MRI had been negative for potential diagnostic causes of that condition. He noted a possible link between her vertigo symptoms and low blood sugar.

Dr. Hamburger also noted tenderness in Cerqueira's right wrist and shoulder, and her lumbar spine. He indicated that she had limited range of motion with flexion of 90 degrees, without pain.

On July 26, 2012, Cerqueira underwent x-rays of her right wrist, which showed normal mineralization without a fracture or acute articular abnormality, and unremarkable soft tissues. The joint spaces were preserved.

On the same date, the Plaintiff also underwent x-rays of her right shoulder, which also showed normal mineralization without a fracture, and no narrowing of the glenohumeral joint space. However, the report noted moderate to severe degenerative changes at the acromioclavicular joint with an inferior osteophytic spur from the distal clavicle.

On September 20, 2012, Dr. Dhiren Mehta, a gastroenterologist, completed an Irritable Bowel Syndrome Residual Functional Capacity Questionnaire with respect to the Plaintiff's condition. The questionnaire does not indicate the dates on which the Plaintiff was examined. Nevertheless, Dr. Mehta diagnosed Cerqueira with grade-A esophagitis, hiatal hernia, and mild gastritis. Her prognosis was "good", but with an exacerbation of IBS, internal hemorrhoids, and mild diverticulitis. He noted that she experienced symptoms including abdominal pain; nausea; abdominal distention; fatigue; mucus in stool; and sweatiness. Cerqueira reportedly also experienced pain in connection with intermittent nausea, heartburn, diarrhea, and constipation. Dr. Mehta noted that stress contributes to the severity of her symptoms and, thus, he opined that she cannot tolerate even low-stress jobs.

A colonoscopy showed mild diverticulitis and internal hemorrhoids, with no irritation or bleeding.

Dr. Mehta estimated that Cerqueira could sit for 30 minutes at one time, before needing to get up, and could stand for 15 minutes at one time, before needing to sit down again. He noted that the Plaintiff could sit or stand for a total of approximately two hours or less, and would require three 15 to 20-minute unscheduled breaks every eight-hour workday. He further noted that she would require four 20 to 30-minute rests at unpredictable intervals per eight-hour workday. Dr. Mehta indicated that Cerqueira would likely be absent from work four days per month due to her gastrointestinal impairment.

### 2. The Hearing Before ALJ Weiss

As noted above, on October 2, 2012, a hearing was held to consider the initial denial of the Plaintiff's application for disability benefits. The following facts are drawn from her testimony at the hearing.

Cerqueira was born on July 25, 1964 and, as noted above, was 46 years old at the time of the onset of her alleged disability. She obtained a GED, but did not attend college.

She lives with her husband. They have no children. She also lives with, and cares for, her aging parents. In particular, the Plaintiff testified that she takes them to doctor's appointments and cooks family meals.

Cerqueira does the household shopping, but finds herself so tired afterwards that she is inactive the following day. She cleans the house, less now than she used to, and her father does the dishes.

From 1994 to 2007, she worked steadily as a secretary and administrative assistant in her brother's trucking business. The company operated from the Plaintiff's home, so her workload and schedule were flexible and could be modified to accommodate physical symptoms. Cerqueira acknowledged that she was younger then, and suffered from fewer ailments during that time.

When the trucking business ceased to be a going concern, the Plaintiff was unemployed until September 2009, when she began working as a telemarketer. In this capacity she experienced pain from sitting in a chair for long periods of time. She also experienced nausea and painful stomach cramps throughout the day. This caused her to have difficulty concentrating and made her become stressed around other people. At the time of the hearing, Cerqueira testified that she could remain seated for varying lengths of time, sometimes for an hour or more.

The Plaintiff maintained a position as a telemarketer until being "let go" at an unspecified time in 2010. According to her testimony, she called in sick one time, and was discharged two weeks later.

For several months thereafter, Cerqueira looked for a new job but eventually stopped doing so, asserting that it had become too difficult due to her sickness. At the time of her hearing, Cerqueira was not working.

With respect to her alleged medical impairments, Cerqueira testified that she suffers from severe IBS, lupus, polycystic ovarian syndrome, and carpal tunnel syndrome. In addition, the Plaintiff stated that she has a "problem with [a] disc in [her] back that the pain goes all the way down [her] left leg . . .," although she could not recall the name of that condition. Also, Cerqueira testified that she suffers from vertigo. In that regard, she explained that she went to the emergency room in January 2012 with a particularly severe episode of vertigo. She also experiences mild episodes that result in momentary dizziness and nausea.

The Plaintiff believes that she can no longer work as an administrative assistant or a telemarketer. Some days, she said, she cannot "get it together to get in the shower" and "out of the house" — on such days it may take her one-and-a-half hours to get showered and dressed. Compounding matters, if she has what she describes as a "bad stomach day," she can unexpectedly find herself using the bathroom for 20 or 30 minutes at a time. The experience allegedly leaves her so exhausted that she needs to lie down afterwards.

The Plaintiff testified that, all told, she would require unscheduled breaks three times a week, and would unexpectedly need to lie down and rest four times a month.

Cerqueira further testified that she suffers from carpal tunnel syndrome, which is painful and causes difficulty writing and typing. Activities that require increased use of her hands intensify the pain. She occasionally has to stop writing

or typing to let the pain subside; she estimates that she drops things five times a week.

Cerqueira also testified that she has shoulder "problems", but did not elaborate on that.

As for the Plaintiff's back problems, she stated that she is in constant pain and cannot lift objects weighing greater than five or ten pounds. She also described an intense episodic pain that extends down to her ankle. The pain does not prevent her from walking, but, as noted above, if she exerts herself one day, she will need the next day to physically recover.

### 3. The ALJ's Decision

On October 17, 2012, ALJ Weiss issued the decision that forms the basis of this appeal.

Initially, ALJ Weiss found that Cerqueira suffered from the following impairments: lumbar spine disorder, lupus, bilateral carpal tunnel syndrome, IBS, and hypertension. He noted that, although the Plaintiff alleged symptoms due to stress and anxiety, there was insufficient medical evidence suggesting a psychological abnormality that would qualify as an impairment under the Act. In addition, although the Plaintiff claimed to suffer from vertigo, she had conceded that testing revealed no underlying diagnostic cause for the condition. Therefore, it, too, was not a medically determinable impairment.

Ultimately, ALJ Weiss determined that Cerqueira had the residual functional capacity, previously defined herein as "RFC," to perform the full range of

sedentary work identified in 20 C.F.R. 404.1567(a). In particular, although the Plaintiff contended that her impairments prevent her from working or, sometimes, even leaving the house, the ALJ noted that:

> [The Plaintiff admitted at the hearing that she spends her days taking care of herself and her family. She testified that she lives with her parents and husband. She revealed that she drives her parent[s] to their medical appointments, cooks family meals, and goes shopping. She testified that she can lift up to 10 pounds.

Accordingly, ALJ Weiss found that, although Cerqueira's medically determinable impairments could reasonably be expected to cause the alleged symptoms, her "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."

In reaching his conclusion, the ALJ opined, in pertinent part, as follows:

> [A] magnetic resonance image (MRI) of the lumbar spine date[d] August 6, 2011 showed only degenerative disc disease with small bulges at L1-L2 and L3-L4 without stenosis or nerve compression. A sonogram of the thyroid, neck, and head dated September 15, 2011 showed bilateral complex thyroid nodules and asymmetric enlargement of the right thyroid lobe. A CT scan of the abdomen and pelvis dated August 20, 2008 was negative. The results of an electromyography and nerve conduction study (EMG/NCV) dated July 8, 2011 was consistent with sensory polyneuropathy involving the lower limbs but presented no evidence of active lumbar radiculopathy. An EMG/NCV dated August 15, 2011 showed only to early moderate carpal tunnel syndrome on the right and very mild carpal tunnel syndrome on the left. The results of a colonoscopy w[ere] reported to show only mild diverticulitis and internal hemorrhoids and no irritation or bleeding.
> . . . [P]hysical examinations have demonstrated 5/5 motor strength in all extremities with normal tone and no atrophy, normal gait and station, 2+ and symmetrical deep tendon reflexes, no Babinski signs, intact sensation to pin prick, light touch, vibration, and position sense. In a letter dated July 5, 2011, Richard A. Pearl, M.D., an

examining neurologist, characterized the [Plaintiff]'s irritable bowel syndrome and lupus as "under control." Treatment notes from Rheumatology Associates of Long Island indicated that the [Plaintiff]'s pattern of joint pain related to lupus has been "stable and nonprogressive" and that the [Plaintiff] reported osteoarthritic joint discomfort as only "mildly uncomfortable." In a health assessment questionnaire dated July 12, 2011 and October 11, 2011, the [Plaintiff] reported no to only mild pain in various joint areas and no difficulty dressing herself (including tying shoelaces and doing buttons), bathing, lifting a glass to her mouth, turning on regular faucets on and off [*sic*]. Significantly, the [Plaintiff] has only had conservative treatment and has not required emergency room treatment nor hospitalization for exacerbation of her symptoms.

The ALJ weighed the opinions of the Plaintiff's examining physicians and the State's non-examining consulting physician as follows:

> . . . [S]ignificant weight is assigned to Dr. Marasign [*sic*], as it is consistent with diagnostic imaging and testing, the [Plaintiff]'s conservative course of treatment, and the [Plaintiff]'s admitted activities. Little weight is assigned to the opinion of Diren C. Mehta, M.D. [*sic*], that the [Plaintiff] cannot perform even sedentary work, as it is inconsistent with diagnostic imaging and the [Plaintiff]'s conservative course of treatment. Little weight is assigned to the opinion of Ranjana D. Mehta, M.D., that the claimant is "fully disabled," as it is vague and inconsistent with treatment records.

Based on these findings, the ALJ concluded that Cerqueira can perform her past relevant work as a telemarketer and administrative assistant, as those occupations are generally performed in the national economy.

### 4.     The Plaintiff's Request for Appeals Council Review

On November 24, 2012, the Plaintiff submitted a written request for administrative review of the decision of ALJ Weiss.

In connection with this request, the Plaintiff submitted additional evidence for the Appeals Council to review. In particular, Cerqueira relied upon a July 10,

2012 report of x-rays taken of her right shoulder, which showed normal mineralization without a fracture, and no narrowing of the glenohumeral joint space. The report noted moderate to severe degenerative changes at the acromioclavicular joint with an inferior osteophytic spur from the distal clavicle.

Similarly, the Plaintiff relied upon an August 28, 2012 Irritable Bowel Syndrome Residual Functional Capacity Questionnaire completed by Dr. Dhiren Mehta. As with the prior questionnaire completed by Dr. Mehta, discussed above, there is no indication as to when Cerqueira was examined. Nonetheless, Dr. Mehta's findings on this date were virtually identical to those recorded on September 20, 2012.

Finally, on October 16, 2012, Dr. Hamburger examined the Plaintiff. The reported findings are materially indistinguishable from Cerqueira's previous visits with Dr. Hamburger. In this regard, the doctor again noted that the Plaintiff's discomfort from osteoarthritis was mildly uncomfortable and that her pattern of joint symptoms consisted of episodic flare-ups with symptom-free periods in between. She had complained of pain in her right wrist and lower back, but Dr. Hamburger noted that her fatigue was improving. He also noted that her pattern of joint symptomology related to lupus was stable and nonprogressive.

On January 6, 2014, the Appeals Council denied the Plaintiff's request for review, and the decision of ALJ Weiss became the final decision of the Commissioner. This action ensued.

**C.      The Instant Motions**

The Commissioner moves, pursuant to Fed. R. Civ. P. 12(c), for judgment on the pleadings, affirming the ALJ's decision, based on the contention that ALJ Weiss appropriately weighed the record evidence and correctly determined that Cerqueira was not disabled.

The Plaintiff contends that the ALJ committed reversible error and cross-moves, also under Fed. R. Civ. P. 12(c), for an Order overturning the ALJ's decision and remanding her claim to the Commissioner for a calculation of damages.  In the alternative, Cerqueira seeks to vacate the ALJ's decision and remand the claim for further administrative proceedings.  The Plaintiff's cross-motion is based on three principal contentions.  First, the Plaintiff asserts that ALJ Weiss erroneously relied heavily upon the report of Dr. Marasigan, a non-examining physician.  Second, Cerqueira contends that ALJ Weiss erroneously failed to accord the proper weight to the findings of Dr. Dhiren Mehta.  Third, the Plaintiff contends that ALJ Weiss erroneously failed to elicit testimony at the hearing from an independent medical expert with regard to conflicting medical evidence in the record.

Each of these contentions is discussed more fully in this opinion.

## II.      Discussion

**A.      The Standard of Review**

"An unsuccessful claimant for Social Security benefits may bring an action in federal district court to obtain judicial review of the denial of their benefits within sixty days after the mailing of notice of such decision or within such further time as

the Commissioner of Social Security may allow." Sheerinzada v. Colvin, 4 F. Supp. 3d 481, 494 (E.D.N.Y. 2014) (Spatt, J.) (quoting 42 U.S.C. §§ 405(g), 1383(c)(3)) (internal quotation marks omitted).

"When reviewing the decision of the Commissioner, the Court may set aside the determination only if the decision was based on legal error or was not supported by substantial evidence in the administrative record." Id. (citing 42 U.S.C. § 405(g); Jasinski v. Barnhart, 341 F.3d 182, 184 (2d Cir. 2003; Brown v. Apfel, 174 F.3d 59, 61-62 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999)). "Substantial evidence is 'more than a mere scintilla,' Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971), and requires such relevant evidence that a reasonable person 'might accept as adequate to support a conclusion.' Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008)." Id.

So long as the Commissioner's determination is supported by substantial evidence, the decision must be upheld, "even if there also is substantial evidence for the [P]laintiff's position.'" Restrepo v. Colvin, 12-cv-4837, 2014 U.S. Dist. LEXIS 29230, at *36 (S.D.N.Y. Mar. 3, 2014) (Report and Recommendation) (quoting Morillo v. Apfel, 150 F. Supp. 2d 540, 545 (S.D.N.Y. 2001)), adopted, 2014 U.S. Dist. LEXIS 123783 (S.D.N.Y. Sept. 3, 2014).

"The substantial evidence standard applies not only to basic evidentiary fact-finding but extends to inferences and conclusions drawn from such facts." Gracia v. Apfel, 97-cv-4035, 1998 U.S. Dist. LEXIS 14182, at *10 (S.D.N.Y. Sept. 10, 1998) (citing Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)).

Indeed, "[t]he Commissioner's findings of fact, as well as the inferences drawn from those findings, are conclusive even in cases where a reviewing court's independent analysis of the evidence may differ from the Commissioner's analysis." Id. (citing Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982)); see Restrepo, 2014 U.S. Dist. LEXIS 29230, at *36 (noting that "the court's inquiry is limited to ensuring that the Commissioner applied the correct legal standard and that his decision is supported by substantial evidence"); see also Sheerinzada, 4 F. Supp. 3d at 494 ("[W]hen evaluating the evidence, 'the court may not substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon de novo review' ") (quoting Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991)).

"In determining whether the Commissioner's findings are supported by substantial evidence, the Court must 'examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.' " Id. (quoting Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983)).

In this regard, the regulations specify a series of factors to consider in determining the weight to be given to medical opinions, "regardless of [their] source." 20 C.F.R. § 404.1527(c). Generally, "it is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." Clark v. Commissioner of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998).

However, the Second Circuit has advised that "[t]he law gives special evidentiary weight to the opinion of the treating physician." Id. In particular,

under the so-called "treating physician rule," the opinion of a treating physician concerning the nature and severity of a claimant's impairment, which is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, will be given controlling weight." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

However, it is inappropriate to assign controlling weight to a treating physician's opinion that is "not consistent with other substantial evidence in the record, such as the opinions of other medical experts.'" Saldin v. Colvin, 34 F. Supp. 3d 271, 283 (E.D.N.Y. 2014) (Spatt, J.) (quoting Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004)). In such instances, the ALJ may decline to give a treating physician's opinion controlling weight, but he must apply various analytical factors to determine the weight to actually give it, including: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist." Id.

This Court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

**B.    Analytical Framework for Determining Disability**

"To qualify for disability benefits under 42 U.S.C. § 423(d)(1)(A), a plaintiff must establish her 'inability to engage in any substantial gainful activity by reason

of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months.' " Sheerinzada, 4 F. Supp. 3d at 494 (quoting Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004)). "The Act also provides that the impairment must be of 'such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.' " Id.

As this Court has previously explained:

> Federal regulations set forth a five step analysis that the ALJ must follow when evaluating disability claims, including: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a "severe" medically determinable physical impairment which will impair the claimant from doing basic work activities; (3) whether the claimant's severe medical impairment, based solely on medical evidence, is a limitation that is listed in Appendix 1 of the regulations; (4) an assessment of the claimant's residual functional capacity along with age, education, and work experience. As to the [fifth and final] stage of the inquiry, the burden shifts to the ALJ to show that the claimant can perform alternative work. See 20 C.F.R. §§ 404.1520, 416.920.

Id.

In applying the five-step framework to the facts of this case, the ALJ found as follows: (1) Cerqueira had not engaged in substantial gainful activity since March 15, 2011, the alleged onset date; (2) she suffers from severe impairments, including lumbar spine disorder, lupus, bilateral carpal tunnel syndrome, IBS, and hypertension; (3) she does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526; and (4) she has the residual

functional capacity to perform the full range of sedentary work, as described in 20 C.F.R. § 404.1567(a) and Social Security Ruling 96-9p, as she can lift or carry up to ten pounds, sit up to six hours in an eight-hour day, stand or walk up to two hours in an eight-hour day, and alternate between sitting and standing during regular breaks and a lunch period.

Thus, having found that Cerqueira could perform her past work as an administrative assistant or telemarketer, ALJ Weiss did not reach the fifth element, namely, whether the Plaintiff was capable of performing alternative work.

The Plaintiff contends that ALJ Weiss erred with respect to the fourth factor. In particular, Cerqueira asserts that the record supports a finding that she is incapable of performing even sedentary work, including her past occupations, and, therefore, is entitled to disability benefits.

**C.      The SSA's Interpretation of Sedentary Work**

In this case, the parties do not dispute the existence of the Plaintiff's impairments. Rather, the gravamen of the instant appeal is whether the record establishes that those impairments are so severe that Cerqueira is prevented from performing the full range of sedentary work. Therefore, the SSA's interpretation of sedentary work will necessarily guide the Court's analysis.

However, the Court notes at the outset that "[t]he ALJ is solely responsible for deciding a plaintiff's residual functional capacity." Dowdy v. Barnhart, 213 F. Supp. 2d 236, 246 (E.D.N.Y. 2002) (citing 20 C.F.R. § 404.1546).

The regulations define "sedentary work" as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

In this regard, "occasionally" has been interpreted as "occurring from very little up to one-third of the time, and would generally total no more than about [two] hours of an [eight]-hour workday." Social Security Ruling 96-9p, 1996 SSR LEXIS 6, at *8-*9 ("SSR 96-9p"). Further, "[s]itting would generally total about [six] hours of an [eight]-hour workday." Id. at *9. This includes "a morning break, a lunch period, and an afternoon break at approximately [two]-hour intervals." Id. at *17.

"Unskilled sedentary work also involves other activities, classified as 'nonexertional,' such as capacities for seeing, manipulation, and understanding, remembering, and carrying out simple instructions." Id.

The SSA has observed that sedentary work "represents a significantly restricted range of work" and that those "who are limited to no more than sedentary work by their medical impairments have very serious functional limitations." Id. at *6-*7. Nevertheless, "the ability to do even a *limited* range of sedentary work does not in itself establish disability in all individuals, although a finding of 'disabled' usually applies when the full range of sedentary work is significantly eroded." Id. at *7-*8 (emphasis in original).

The assessment of someone's capacity to perform sedentary work "considers only those limitations and restrictions that are caused by an individual's physical or mental impairments [in this case, lumbar spine disorder, lupus, bilateral carpal tunnel syndrome, IBS, and hypertension]. It does not consider limitations or restrictions due to age or body habitus, since the Act requires that an individual's inability to work must result from the individual's physical or mental impairment(s)." Id. at *3-*4.

**D.  As to Whether the ALJ's Decision to Give Substantial Weight to Dr. Marasigan and Only Little Weight to Dr. Mehta Was Supported by Substantial Evidence**

Cerqueira challenges the ALJ's decision on the ground that he erred in giving substantial weight to the opinion of Dr. Marasigan, a non-examining consulting physician. She also challenges the ALJ's decision on the grounds that he gave little weight to Dr. Mehta, who examined the Plaintiff, albeit on an unspecified number of occasions and on unspecified dates. The Court agrees with both contentions.

**1.  Dr. Marasigan's Opinions Should Not Have Been Afforded Significant Weight**

ALJ Weiss afforded significant weight to the conclusions of the consultative physician, Dr. Marasigan. Dr. Marasigan did not examine the Plaintiff and admittedly reviewed only a portion of her treatment records and diagnostic studies. See, e.g., R. 382 (noting that the results from the August 15, 2011 EMG/NCV of the Plaintiff's hands, which showed bilateral carpal tunnel syndrome, were not on file).

Ultimately, Dr. Marasigan concluded that Cerqueira could lift and/or carry ten pounds; stand and/or walk for two hours per day; and sit for six hours per day.

Dr. Marasigan further concluded that "[t]he need to alternate sitting and standing can be done during breaks and lunch period." For the reasons set forth below, the ALJ was not justified in affording Dr. Marasigan's opinions significant weight, and the ALJ applied incorrect legal standards in weighing Dr. Marasigan's opinion.

"The regulations provide that generally more weight is given to an examining medical source, than to a non-examining medical source." Johnston v. Colvin, 13-cv-073, 2014 U.S. Dist. LEXIS 45501, at *81 (D. Conn. Feb. 20, 2014) (citing 20 C.F.R. § 404.1527(c)(1)) (Recommended Ruling), adopted, 2014 U.S. Dist. LEXIS 44486 (D. Conn. Mar. 31, 2014). " '[W]hile the findings of non-examining analysts can, and often do, provide valuable supplemental support for an ALJ's decision, they should generally be afforded relatively little weight in the overall disability determination.' " Id. at *81-*82 (quoting Freegard v. Astrue, 11-cv-012, 2011 U.S. Dist. LEXIS 121520 (D. Vt. Sept. 20, 2011) (Report and Recommendation), adopted, 2011 U.S. Dist. LEXIS 19948 (D. Vt. Oct. 17, 2011)); see Vergas v. Sullivan, 898 F.2d 293, 295-96 (2d Cir. 1990) ("The general rule is that the written reports of medical advisors who have not personally examined the claimant deserve little weight in the overall evaluation of disability. The advisor's assessment of what other doctors find is hardly a basis for competent evaluation without a personal examination of the claimant" (internal quotation marks and citations omitted)).

A review of the entire record reveals nothing to suggest that Dr. Marasigan's opinion of Cerqueira's RFC merited substantial weight. In this regard, it is useful

to distinguish the problematic portions of Dr. Marasigan's opinions from those that are not problematic.

> ### a. As to Dr. Marasigan's Opinion of the Plaintiff's Lumbar Spine Disorder, Lower Limb Problems, Lupus, and Carpal Tunnel Syndrome

The Court acknowledges that Dr. Marasigan's report largely and accurately mirrors the findings of the Plaintiff's treating physician, Dr. Hamburger, and other examining sources, with respect to her lumbar spine disorder; her lower limb issues; her lupus; and her carpal tunnel syndrome. In *this* regard, the Court finds no error in the ALJ's heavy reliance upon Dr. Marasigan's report.

Indeed, Dr. Marasigan's report directly references the Plaintiff's lumbar spine disorder as follows: "xray of spine increase sclerosis sacroiliac joint . . . bilateral tenderness of paraspinous muscle. ROM are painless." In the Court's view, this notation clearly reflects the findings of Dr. Hamburger, who repeatedly noted that, with respect to her lumbar spine, the Plaintiff had a limited range of motion, with flexion of 90 degrees, without pain. It is also reflective of the November 24, 2004 x-rays of Cerqueira's lumbar spine, which noted increased sclerosis around the sacroiliac joints.

Dr. Marasigan also accurately referenced Cerqueira's leg problems, by observing: "11/04 [*sic*] left knee partial ACL tear; rt. knee narrow joint space . . . 10/11/11 follow up for the osteoarthritis left leg – joint symptoms are episodic and asymptomatic in between." It is clear that these notations reflect the November 24, 2004 x-rays, which noted early degenerative arthritic changes in her

left knee and narrowing of the medial joint space in the right knee; the April 17, 2006 MRI, which showed a partial ACL tear; and the repeated findings of Dr. Hamburger that her pattern of joint symptoms consisted of episodic flare-ups with symptom-free periods in between.

Dr. Marasigan also referenced the Plaintiff's lupus explicitly: "has SLE—joint systems are stable and non-progressive." It is clear that this opinion is reflective of Dr. Hamburger's continuous observation throughout his treatment of Cerqueira that her lupus was under control and that her joint pain related to the condition remained stable and nonprogressive.

Finally, Dr. Marasigan referenced the Plaintiff's bilateral carpal tunnel syndrome, as follows: "had EMG hand and CT scan 'not bad.'" This is consistent with the August 15, 2011 EMG, which indicated mid- to early-stage bilateral carpal tunnel syndrome.

Thus, to the extent Dr. Marasigan's report evaluated the findings of the Plaintiff's treating and examining physicians with respect to her *non-gastrointestinal* impairments, the report is consistent with, and supported by, substantial medical and diagnostic evidence in the record. Therefore, the ALJ did not err in relying significantly upon those particular portions of the consultative report.

**b.     As to Dr. Marasigan's Opinion of the Plaintiff's Irritable Bowel Syndrome ("IBS")**

However, Dr. Marasigan failed to address Cerqueira's history of IBS and related symptomology, which forms a central part of her claim. This is troublesome

for two reasons. First, as the Plaintiff correctly points out, without this analysis, Dr. Marasigan's report is incomplete. Second, in the Court's view, without evaluating the medical evidence relating to Plaintiff's IBS, Dr. Marasigan was ill-equipped to opine on her capacity to perform relevant functions of sedentary work, such as sitting and standing for extended periods of time. These failings lead to the conclusion that Dr. Marasigan's assessment of Cerqueira's RFC is not based on substantial evidence, and the ALJ committed clear error in substantially relying on those portions.

The record contains significant evidence relating to the irritable bowel syndrome experienced by Cerqueira. Without expressing an opinion as to the inferences properly to be drawn from that evidence, the Court again notes that Dr. Marasigan appears not to have reviewed any of the records relating to that serious condition. For example, in an April 22, 2008 health assessment questionnaire, the Plaintiff complained of gastrointestinal symptoms and indicated that she had been prescribed medication for "severe IBS." On March 11, 2009, Dr. Hamburger noted that such symptoms had been much improved. On July 5, 2011, Dr. Pearl observed that the Plaintiff suffers from IBS. Of particular importance, in the September 22 and August 28, 2012 questionnaires, Dr. Dhiren Mehta noted that Cerqueira had experienced an exacerbation of IBS, with severe secondary symptoms, and expressed explicit opinions that Cerqueira could not perform certain relevant functions of sedentary work.

Dr. Marasigan did not address any of this evidence. In fact, on the second page of his report, Dr. Marasigan indicated that Cerqueira's primary diagnosis is lupus, and her secondary diagnosis is "degenerative musculoskeletal." Thus, Dr. Marasigan either did not know the Plaintiff has IBS, or did know, but chose to ignore it. Whichever the case, as a result, his findings are flawed.

Under normal circumstances, the findings of non-examining consulting physicians are not entitled to great weight. Where, as here, the non-examining consultant expressed opinions which are (a) based on an incomplete record and (b) at variance with findings of examining physicians, his findings are entitled to even less weight. Accordingly, in the Court's view, in substantially relying on the non-examining physician's report, the ALJ committed error, requiring a remand for further administrative proceedings consistent with this opinion. In this regard, the ALJ is directed to re-evaluate Dr. Marasigan's opinion in light of the opinions of Cerqueira's examining physicians, particularly with respect to her irritable bowel syndrome and related gastrointestinal symptomology, and how those impairments impact the RFC determination. Accordingly, the portion of the Plaintiff's cross-motion seeking reversal of the ALJ's decision on this basis is granted. The Defendant's motion, to the extent it seeks to affirm the manner in which the ALJ weighed the medical opinions in the record, is denied.

### 2. Dr. Mehta's Opinions Should Not Have Been Given Little Weight

The Plaintiff also contends that ALJ Weiss erred by according insufficient weight to the opinions of examining physician Dr. Dhiren Mehta.

Initially, as discussed above, under the "treating physician rule," the SSA gives deference to the views of the physician who has engaged in the primary treatment of a claimant. Burgess v. Astrue, 537 F.3d 117, 128 (2d Cit. 2008); 20 C.F.R. § 404.1527(c)(2). Without expressly invoking this rule, Cerqueira contends that the ALJ erroneously assigned lesser weight to the opinions of Dr. Mehta than was appropriate. In this regard, she contends that "the ALJ failed to accord proper weight to" Dr. Mehta's opinions, but fails to assert what she believes the proper weight to be. In fact, the Plaintiff is careful not to label Dr. Mehta as a "treating physician," and thereby imply that his opinions are entitled to controlling weight. Rather, Cerqueira refers to Dr. Mehta as an "examining physician," which does not require the same legal deference.

Thus, before turning to the ALJ's evaluation of Dr. Mehta's testimony, the Court must consider the applicability of the "treating physician rule" to Dr. Mehta.

### a. Dr. Mehta is Not a "Treating Physician" Whose Opinion is Entitled to Controlling Weight

At the outset, the Court notes that the record contains opinions from two separate doctors, both of whom have the surname "Mehta." One of these individuals is Dr. Ranjana Mehta, a physician whose specialty is not clear from the record. On July 31, 2009, Dr. Ranjana Mehta wrote a non-diagnostic, personal note indicating that his medical practice had treated the Plaintiff since 1985. In addition, on August 22, 2009, he noted on a prescription pad that the Plaintiff was "fully disabled" at that time. However, Cerqueira raises no issues regarding the weight given to this doctor's opinions.

Rather, the Plaintiff focuses on the weight given to the opinions of Dr. Dhiren Mehta, a gastroenterologist. Parenthetically, the Court notes that the record is unclear as to whether this physician's first name is "Dhiren," or "Dhiven" – relevant medical records reflect both spellings. <u>See</u> R. 390-93. In any event, further references in this opinion to "Dr. Mehta" relate to Dr. Dhiren Mehta.

As described above, on August 28 and September 22, 2012, Dr. Mehta submitted Irritable Bowel Syndrome Residual Functional Capacity Questionnaires. However, these questionnaires do not indicate when or how often Dr. Mehta treated the Plaintiff. In addition, the questionnaires themselves do not appear to reflect Cerqueira's condition prior to August 28, 2012, more than one year and five months after the alleged onset of her disability. Thus, the Court finds no rational basis for treating Dr. Mehta's opinions as controlling with respect to whether Cerqueira was capable of performing sedentary work – and thereby was entitled to collect disability benefits – dating back to March of 2011.

Indeed, "[i]n general, such deference [to the opinions of treating physicians] is warranted because treating sources are 'most able to provide a detailed, longitudinal picture . . . and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.' " <u>Mullings v. Colvin</u>, 13-cv-1705, 2014 U.S. Dist. LEXIS 163783, at *35 (E.D.N.Y. Nov. 21, 2014) (quoting 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2)); <u>see</u> <u>Valet v. Astrue</u>, 10-cv-3282, 2012 U.S. Dist. LEXIS 7315, at *61-*62 (E.D.N.Y.

Jan. 23, 2012) (noting that a treating source has an ongoing treatment relationship with his or her patient) (quoting 20 C.F.R. § 404.1502).

Thus, the regulations explicitly distinguish opinions of treating physicians – which are presumed to be the products of ongoing treatment relationships and thereby capable of providing a "longitudinal picture" of the patient's health – from reports created after individual examinations or brief hospitalizations, which, by their nature, lack similar indicia of reliability. In this case, there is no reason to conclude that the opinions of Dr. Mehta reflect a uniquely longitudinal perspective on the Plaintiff's health that would make them worthy of controlling deference.

This is especially true in light of the fact that Dr. Mehta, a gastroenterologist, did not make any observations of the Plaintiff's other impairments that she now contends contribute to her disability. To the extent that a treating physician is presumed to have engaged in the long-term primary treatment of a claimant, the evidence relating to Dr. Mehta does not satisfy this standard. Rather, the evidence suggests that Dr. Mehta examined Cerqueira's health from a gastrointestinal perspective, and may not have reviewed other relevant portions of her medical file.

Accordingly, based on the current record, the Court finds that Dr. Mehta was not a "treating physician" within the meaning of the statute. Therefore, as a matter of law, the ALJ was under no affirmative obligation to give Dr. Mehta's opinions controlling weight or to provide "good reasons" for not doing so. <u>See</u> 20 C.F.R. § 404.1527(c)(2).

### b. The ALJ Failed to Properly Weigh Dr. Dhiren Mehta's Opinions

Having found that Dr. Dhiren Mehta was not a "treating physician" within the meaning of the Act, the Court now turns to examine whether ALJ Weiss nevertheless afforded Dr. Mehta's conclusions less weight than what reasonably should have been afforded. The Court finds that he did not afford Dr. Mehta's opinions the proper weight, which constitutes an error requiring a remand on this alternative basis.

As discussed above, the relevant findings and opinions contained in Dr. Mehta's August 28 and September 22, 2012 questionnaires are materially indistinguishable. In particular, they indicate that the Plaintiff was diagnosed with grade-A esophagitis, hiatal hernia, and mild gastritis. A colonoscopy, performed on an unspecified date, showed internal hemorrhoids and mild diverticulitis. Her symptoms included abdominal pain and cramping, nausea, abdominal distention, fatigue, mucus in stool, sweatiness, diarrhea, and constipation. D. Mehta opined that Cerqueira cannot tolerate low-stress jobs because stress intensifies her symptoms.

Of principal importance to the instant analysis, Dr. Mehta indicated that the Plaintiff could only sit for 30 minutes before needing to get up, and could only stand for 15 minutes before needing to sit down again. Dr. Mehta noted that the Plaintiff could only sit or stand for a total of approximately two hours or less in an eight-hour day, and would require several unscheduled breaks and resting periods throughout the day.

These findings concerning the impact of Cerqueira's irritable bowel syndrome on her ability to stand and sit for extended periods of time are germane to the RFC analysis. Indeed, they relate directly to particular functions of sedentary work that are set forth in the regulations.

In the Court's view, the ALJ's evaluation of this evidence was incorrect in part. In particular, the ALJ stated that he assigned little weight to Dr. Mehta's opinion "that the [Plaintiff] cannot perform even sedentary work." This was erroneous because Dr. Mehta never expressed such an opinion. Actually, Dr. Mehta indicated that Cerqueira could not perform even *low stress* jobs," because stress intensifies her gastrointestinal symptoms. Dr. Mehta did not opine that Cerqueira cannot perform "even sedentary work," as the ALJ, apparently, mistakenly believed. This distinction is material to the instant analysis.

Indeed, under the regulations, determining someone's capacity to perform sedentary work "considers only those limitations and restrictions that are caused by an individual's physical or mental impairments." See SSR 96-9p, at *3-*4. However, stress is *not* one of the Plaintiff's recognizable impairments. Therefore, Dr. Mehta's opinion that the Plaintiff cannot perform "*low stress* jobs" is not necessarily relevant to whether she can perform sedentary work. Nevertheless, the ALJ apparently misconstrued this medical opinion and then assigned it little weight.

To the extent the ALJ discounted Dr. Mehta's opinions based on a misapprehended meaning, his decision was erroneous.

Moreover, in reaching his decision concerning the weight to assign Dr. Mehta's opinion, the ALJ failed to address those portions of Dr. Mehta's findings which are directly relevant to the RFC analysis, namely, the impact Cerqueira's IBS has on her ability to stand and sit for particular lengths of time.

Dr. Mehta's assessment, and the findings upon which it is based, provide the most recent medical evidence of the Plaintiff's irritable bowel syndrome by an examining physician. It also constitutes the only medical opinion in the record regarding the specific impact Cerqueira's IBS has on her ability to perform the functions of sedentary work. However, the ALJ discounted Dr. Mehta's opinion, without an adequate explanation.

Instead, he stated that Dr. Mehta's opinions were "inconsistent with diagnostic imaging and the claimant's conservative course of treatment." This opinion is insufficient to satisfy an ALJ's responsibility to consider the relevant analytical factors in deciding what weight to give the opinion of an examining physician. See, e.g., Valet v. Astrue, 10-cv-3282, 2012 U.S. Dist. LEXIS 7315, at *61 (E.D.N.Y. Jan. 23, 2012) ("An ALJ is 'free to conclude that the opinion of a [non-treating source] was not entitled to any weight,' so long as the ALJ explains that decision") (quoting Canales v. Comm'r of Soc. Sec., 698 F. Supp. 2d 335, 344 (E.D.N.Y. 2000)); Martinez v. Astrue, 06-cv-6219, 2010 U.S. Dist. LEXIS 6955, at *26-*27 (S.D.N.Y. Jan. 11, 2010) (Report and Recommendation) (" 'If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted' ") (quoting Social Security Ruling 96-8p,

1996 SSR LEXIS 5, at *21), adopted, 2010 U.S. Dist. LEXIS 7017 (S.D.N.Y. Jan. 28, 2010); cf., Sutherland v. Bernhart, 322 F. Supp. 2d 282 (E.D.N.Y. 2004) (holding, with regard to a treating source, that "[i]t is not enough for the ALJ to simply say that [the physician's] findings are inconsistent with the rest of the record").

In the Court's view, the ALJ erred by (a) giving diminished weight to Dr. Mehta's opinion based, in part, on a mistaken interpretation of the doctor's conclusion, and (b) discounting Dr. Mehta's opinion as to the Plaintiff's IBS without adequately explaining his consideration of the relevant analytical factors for assigning weight to medical opinions. As a result, the Court finds that the ALJ's decision requires reconsideration and that remand for further administrative proceedings consistent with this opinion is appropriate. In this regard, on remand, the ALJ is directed to re-evaluate Dr. Mehta's findings as to the Plaintiff's capacity to sit and stand due to IBS relative to the factors found in 20 C.F.R. § 404.1527.

Accordingly, the portion of the Plaintiff's cross-motion seeking reversal of the ALJ's decision on this alternative basis is granted. The Defendant's motion, to the extent it seeks to affirm the manner in which the ALJ weighed the medical opinions in the record, is also denied on this basis.

## E. As to the Failure to Elicit Testimony from a Medical Expert

Cerqueira also challenges the ALJ's decision on the ground that he erroneously failed to elicit testimony at the hearing from a medical expert with regard to allegedly conflicting medical evidence in the record. In this regard, the Plaintiff contends that the opinions of Dr. Mehta and Dr. Marasigan are

inconsistent and, therefore, "it would have been proper to obtain testimony from a medical expert in order to determine the Plaintiff's residual functional capacity."

In light of the Court's opinion that the ALJ failed to properly weigh the opinions of Drs. Mehta and Marasigan, it need not consider whether additional testimony was previously needed to resolve alleged inconsistencies. Accordingly, the Plaintiff's cross-motion, to the extent it seeks to reverse the ALJ's decision on this basis, is denied.

If, however, on remand, the ALJ is confronted with conflicting or confusing medical evidence, or a clear evidentiary gap in the record, he, of course, is reminded of his "affirmative duty to develop the medical record and seek out further information." Ortiz v. Colvin, 13-cv-6463, 2014 U.S. Dist. LEXIS 105191 (W.D.N.Y. July 31, 2014) (citing Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999)); see Pratts v. Chater, 94 F.3d 34 (2d Cir. 1996) ("It is the rule in our circuit that 'the ALJ, unlike a judge in a trial, must affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding' ") (quoting Echevaria v. Sec'y of HHS, 685 F.32d 751, 755 (2d Cir. 1982).

## III.   Conclusions

For the foregoing reasons, it is hereby

**Ordered**, that the Plaintiff's cross-motion for judgment on the pleadings is granted in part and denied in part; and it is further

**Ordered**, that the Commissioner's motion for judgment on the pleadings is denied; and it is further

**Ordered**, that the October 17, 2012 decision of the ALJ is vacated; and it is further

**Ordered** that this case is remanded to the ALJ for another hearing consistent with this Memorandum of Decision and Order; and it is further

**Ordered**, that the Clerk of the Court is directed to close this case.

**SO ORDERED**

Dated: Central Islip, New York
August 4, 2015

/s/ Arthur D. Spatt
ARTHUR D. SPATT
United States District Judge